487 So.2d 820 (1986)
Eli TRUNELL
v.
STATE of Mississippi.
No. 56249.
Supreme Court of Mississippi.
April 23, 1986.
Rehearing Denied May 21, 1986.
*821 George F. West, Jr., Natchez, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by John H. Emfinger, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and HAWKINS and PRATHER, JJ.
HAWKINS, Justice, for the Court:
Eli Trunell appeals from his conviction in the circuit court of Jefferson County of murder.
Because the circuit judge refused to permit Trunell to make an opening statement pro se without being sworn as a witness, we reverse.

FACTS
The grand jury of Jefferson County on October 4, 1983, indicted Trunell for the murder of George Inman while in commission of a robbery on June 27, 1983, in violation of Miss. Code Ann. § 97-3-19(2)(e) (1972), the capital murder statute.
Inman was a 77-year-old man who lived alone in his house trailer. During the lunch hour on June 29, 1983, Inman purchased groceries at New Deal Supermarket in Fayette.
Nathan Wilson, Jr., a friend of Inman's, made it customary practice to go by every afternoon and check on him. On this day Wilson and David Trunell, a brother to the defendant, arrived at the trailer around 4:00 p.m. They detected smoke coming from the trailer; Wilson knocked on the door with no response. The usual big padlock for the door was missing; Wilson pulled the door open and saw Inman lying on the floor. The two then went to Ray Brown, a neighbor's, and related what they had found at Inman's trailer. They then returned to the trailer.
Mrs. Marie Brown telephoned the sheriff's office at 4:26 p.m., and Sheriff J.P. Wallace dispatched Deputy Don Ward to the scene. The sheriff reported the fire to the fire department, and then drove to the scene himself.
Ward arrived ten minutes after the sheriff's office received the report. He noticed the fire was out, but the trailer continued to smoke. When Ward arrived, there were several other people already there, milling around. Inman was lifeless on the floor. Ward also saw the fire truck pass the driveway to the Inman trailer, and radioed Sheriff Wallace, who instructed Ward to go *822 and retrieve the fire truck and lead it back to the fire.
Meanwhile, at approximately 4:45 p.m., a report came over the police radio that there had been an armed robbery around Cleveland Shorter's, a cafe owner. About the time Ward caught up with the fire truck and was in the process of turning it around, he was flagged down by Benny Nichols and Trunell, who was riding in Nichols' car. Trunell got out of the car and flagged Ward down, and when he stopped Trunell related the robbery incident to him. Ward then asked Nichols if he would lead the fire truck on down to the fire, and he asked Trunell to get in the car with him to go and show where the robbery had taken place.
Trunell later gave the following written statement as to the "robbery":
As I was walking sought and about 100 yards from the creek bridge, near Shorter's Cafe on Highway 552, a white male came off the hill from out of the woods and he said, "Hey." I looked around at him. He asked me if I had any money. I told him that I had $35. He said, "If you are lying, I'm going to kill you." The man was white and was carrying a high-powered rifle.
The man made me lay down in the middle of the road, took my billfold and took my clothes off. I had $900 in a secret compartment in the billfold and $35 in the regular place where you keep the money ordinarily. The man disappeared after he took my money and clothes.
After I could tell the man was gone, I got up and ran to my mother's house. I put on some shorts and went to the nearest telephone and called the Sheriff's Department. I reported the robbery to Willie Stewart, a deputy sheriff for the Jefferson County Sheriff's Department.
The "robbery" site was approximately 1.8 miles from the Inman trailer. Ward testified that Trunell also told him the man who robbed him was wearing old raggedy cut-off blue jeans with no shirt on, had blood all over his chest and on his right hip, and had a brown beard and mustache. He said he also came off a dirt bank. There was testimony this bank was between 10 and 20 feet high. Ward searched the robbery area but was unable to find any evidence of the robbery. At the time Ward picked him up Trunell had a cut on his forehead which was bleeding. Trunell explained that he got the cut when the robber made him lie down on the blacktop. Ward took Trunell for further questioning on the robbery as well as any possible relation of this crime to the death of Inman. Trunell was wearing only a pair of blue shorts, and Ward took Trunell by his mother's house and allowed him to change.
An autopsy of Inman's body revealed he had bled to death as a result of a single gunshot wound through the buttocks or lower back, and that he was probably dead before the fire started. The time of death could not be fixed with any reasonable degree of certainty. The groceries which Inman had purchased earlier in the day were found laying under the body and strewn about the floor. None of the gathered crowd of on-lookers were interviewed. No fingerprints were taken. Although there was fresh blood on the trailer floor and dirt inside the trailer, no footprints made from blood or from dirt were attempted to be identified. No murder weapon or spent cartridge was ever recovered. There were two footprints found around the trailer area; one made with what the authorities believed to be a socked foot and the other showed only an indention of toes. A plaster cast was made of the socked footprint, but no other cast was made. The authorities did find other footprints going out the path toward the woods, but again no photographs or casts were made of these footprints. No one took a foot impression of Inman's foot. There was an ink print made of Trunell's foot, but the law enforcement officers were unable to obtain an expert who could give an opinion as to whether the footprints found were Trunell's.
There was never an attempt to obtain a search warrant to search Trunell's mother's *823 house where Trunell went after being robbed, nor was there any attempt to check Trunell's residence.
On the afternoon of the following day, the sheriff did find another footprint in the creek approximately 200 to 250 yards from where Trunell said he was robbed, but there was no picture or cast taken of this footprint.
About a month or two later, squirrel hunters found a pair of black half-boots and a green vest around the general area where Trunell claimed he was robbed, but no one ever found his pants or shirt. The officers found marijuana plants in a cabinet outside Inman's trailer.
Bloodhounds were called in to pick up the trail of the murderer. The dogs lost the trail several times, but eventually came out about 1/10 mile from where Trunell claimed he was robbed. All the officers testified that the dogs did not bark while sniffing out the trail. No attempt was made to trace a trail backwards to the trailer.
At trial an expert called by the defense testified that the fact the dogs did not bark indicated they were unable to pick up a trail.
Around 7:00 or 8:00 o'clock at night Nelson Jensen, an investigator with the Mississippi Highway Safety Patrol, was questioning Trunell and told him that he did not believe his story, and doubted anyone else would. Trunell replied, "Well, I'll tell you how it happened, what happened. But first, I want to go to the bathroom." Trunell then went into the bathroom, and when he came out of the bathroom he broke and ran out the door.
Jensen testified that he did not consider Trunell under arrest when he was questioning him.
Trunell was arrested in the Trailways bus station in Jackson on Saturday, August 20, 1983, after he had been charged with murder. He was taken to the Hinds County Jail, and Sheriff Wallace and his deputies came and took him to the Adams County Jail.
On August 22 Trunell gave the following written statement:
On 28 June 1983, sometime around 2:00 p.m. and 2:30 PM, I burglarized George A. Inman's trailor [sic] (his home). He lived on Highway # 552 near Dennis Cross Roads. I took about a quarter of an ounce of marijuana from within the trailor. Inman was a known dope dealor [sic] in the community. I know that he was a dealor because I have done business with him in the past.
I have been dealing in marijuana myself for about four years. On occasions when someone would do me a bad deal, I would get back at them by doing things like what I did to Inman on the 28th day of June 1983.
On the day I entred [sic] Inman's trailor, I first attempted to get in through a window but a dog scared me off. The dog was inside the trailor. I ran off but returned to the front door and Found it unlocked. I entered through the door and a .22 cal. rifle fell on the floor just inside the door. I picked the rifle up and set it back up like it was. The dog left the living room and went to a back room where he stayed. I started looking for the old man's dope. I knew that he usually kept a supply of dope in and around his trailor. I picked up a short barreled [sic] revolver, blue steeled and started to steal it but I changed my mind and put it back on the table, just inside the door (to the right as you walk inside). After I took the marijuana I left the trailor and returned home. As I got back up to the highway, I saw Inman as he was coming back home. This was about 300 yards from the trailor. I was walking on foot. He was in his pickup. I walked out Highway # 552 towards my mother's home as far as Addie Smith's house. Then I saw Flat Savage and Charles Savage in Addie's garden so I cut into a corn field behind her house to keep them from seeing me.
I crossed the Elmer Scott Road, threw [sic] the pecan trees, went behind Ms. Josie Wilson's house, and came out at the bridge below Shorters Store on highway *824 # 552. Then I went home to my mother's.
That night Cleveland Shorter, Jr.'s son, Jimmy took me back to Fayette that night.
On Wednesday 29 June 1983, around 9:30 AM I left Fayette with John Henry Nealey, Jr., and Boyce Fulton and traveled to Dennis Cross Roads with them. I was trying to get them to catch up with Gretta Scott who was traveling out that way in her car. We were in John Henry's car.
I got out of John Henry's car at Dennis Cross Roads. I was hoping that Gretta would notice that I had got out of the car there and that she would come back and pick me up. She did not return for me. After I gave up on waiting for Gretta, I started walking out Highway # 552 and caught a ride about 1/2 mile north of the cross roads. The white man that picked me up was out there logging. He was in a beige pickup truck. (Chev. or GMC). That man carried me to almost the end of the black top on Highway # 552.
I walked from where the white man put me out to man Coleman's old house. That's a place where we usually take girls for a good time. There is a bed still in the house. No one lives in the house. I was hoping that since Gretta knew of the house, she would meet me there. I have been dating her for about three years. She never came to me.
I stayed there for about two or two and a half hours. Then I walked back to the pavement and back toward the cross roads to a stop sign. I waited for "Poney" James Trevillion so I could catch a ride. I stayed there for about fifteen or twenty minutes then started walking back towards the cross roads.
As I was walking south and about 300 yards from the creek bridge, near Shorter's Cafe on highway # 552, a white male came off the hill from out of the woods and he said "Hey." I looked around at him. He asked me if I had any money. I told him that I had thirty-five dollars. He said "If you are lying I'm gonna kill you." The man was white and was carrying a high powered rifle. The man made me lay down in the middle of the road, took my bildfold [sic], and took my clothes off. I had $900.00 in a secret compartment in the bildfold [sic] and $35.00 in the regular place where you keep the money ordinarilly [sic].
Then man disapeared [sic] after he took my money and clothes.
After I could tell that the man was gone, I got up and ran to my mother's house. I put on some shorts and went to the nearest telephone and called the sheriff's department. I reported the robbery to Willie Stewart, a depty [sic] sheriff for the Jefferson County Sheriff's department.
At trial Wallace testified that Inman's trailer had been robbed two or three times previously, but that Inman had always reported those robberies.
When the state rested at trial, Trunell moved for a directed verdict. The circuit judge ruled the state had failed to make a case of capital murder, but that there was sufficient evidence to make a jury issue on murder.

LAW
Addressing first Trunell's contention that the verdict was against the overwhelming weight of the evidence, while the proof in this circumstantial evidence case was weak, we find that all considered there was sufficient evidence to go to the jury on his guilt. See: Tolbert v. State, 407 So.2d 815 (Miss. 1981). Since this case is going to be remanded for another trial, there is no occasion for us at this time to evaluate the proof offered by the state.
Trunell next assigns that his statement to the law enforcement officers reduced to writing should not have been admitted into evidence because he was denied an opportunity to consult a lawyer. The sheriff and Bill McKinney, an investigator with the Mississippi Highway Safety Patrol, were the only officers attending his interrogation when he confessed. They *825 testified the statement was freely and voluntarily given, and the Miranda warnings scrupulously adhered to. Trunell testified he requested a lawyer, but was told he did not need one and that only the sheriff and Bill McKinney could help him. This was denied by both these officers. Moreover, at trial Trunell testified his statement was freely and voluntarily given, and his only complaint was that his request to consult an attorney was refused. This being specifically denied by the two officers, we find the requirements of Agee v. State, 185 So.2d 671 (Miss. 1966), were met, and there was no error committed by the circuit judge in admitting the statement into evidence.
Trunell next assigns as error that the portion of his statement confessing a burglary of Inman's trailer on the previous day should not have been admitted because it was proof of another crime and served to inflame and prejudice the jury. Trunell misconstrues the rule against allowing proof of separate crimes. When a man is on trial for one crime, the state will not be permitted to put on proof that upon another distinct occasion he committed a completely separate crime. The obvious reason for this rule is that such testimony will highly inflame and prejudice the jury against the defendant on a crime of which he is presumed innocent. The exception to this rule comes about when proof of the other crime has some special relevancy to the case at hand. Were the two crimes part of a chain, a series of connected events? Does proof of the other crime establish an intent, or an identity that might otherwise be lacking? See Gray v. State, 351 So.2d 1342 (Miss. 1977).
This case does not simply involve proof of a separate crime, but admissibility of that portion of a written statement that he had burglarized Inman's trailer. Under the acts of this case, this admission was part of the circumstantial web implicating Trunell, and was competent evidence. The jury was entitled to give the written statement of Trunell such weight and credibility as it chose, accepting part and rejecting part. The jury may very well have believed Trunell burglarized the trailer, but not necessarily the previous day. The fact that Trunell admitted burglarizing Inman's trailer a short while prior to his unexplained murder has some special significance under the unusual facts of this case.
In Reed v. State, 229 Miss. 440, 91 So.2d 269, 272 (1956), we stated:
A confession is an acknowledgement in express terms of the confessor's guilt of the crime charged. An admission is a statement by the accused, direct or implied, of facts pertinent to the issue, and tending, in connection with other facts, to prove his guilt.
The written statement given by Trunell was not a "confession" of the murder. As noted in Reed, it was "a statement of facts pertinent" to this issue, and "tending, in connection with other facts, to prove his guilt." The state was not required to extract that portion embedded in the statement in which he confessed burglarizing the trailer the day previous to the murder.
Trunell's contention that the portion of the testimony of a witness that Trunell had shot craps on the Sunday preceding the homicide of Inman was error does have merit, and on retrial this should be excluded. Was it prejudicial? No doubt there are counties in which this offense against the peace and dignity of Mississippi casts about the same pall over a man's character as overparking or running a stop sign, while just as surely there are others in which it would be considered a sure fire ticket to perdition.
Since this case is being reversed and remanded on a far more serious error, we need not add to our burden in this case of determining in which category Jefferson County falls.
Although far from adequately assigned or presented in Trunell's brief, we must conclude the circuit judge committed reversible error in refusing to permit Trunell himself making an opening statement to the jury. The record reveals the following:

*826 THE COURT: Anything, Mr. Kerstine?
[The defendant, Eli Trunell, stood at the dais before the jury.]
DEFENDANT:
I am the defendant in this case 
MR. STURGEON: Your Honor, we would object to him 
THE COURT: I sustain your objection. Sit down.
[The defendant returned to his seat at the counsel table.]
MR. KERSTINE: Your Honor, there's nothing in the rules of law that says that the defendant cannot make his own opening statement.
THE COURT: Well, if the defendant tells anything to this jury, he's going to be put under oath and he's going to testify. And I'm going to tell you, Mr. Kerstine, he's going to be subject to cross examination.
MR. KERSTINE: Yes sir, we know that.
MR. ROSENTHAL: Are you stating to us, your Honor, that the defendant cannot represent himself?
THE COURT: That is correct. I'm telling you that he cannot stand before this jury and make a statement of facts or evidence that he, unless he subjects himself to cross examination, Mr. Rosenthal.
MR. KERSTINE:
Ladies and gentlemen, I have not had a chance to address you. My name is Ed Kerstine, and I represent Mr. Trunell.
What Mr. Trunell would have said to you this morning is that he is the defendant in this case, that the charges and allegations made against him have to be proved beyond a reasonable doubt and to a moral certainty, and the State of Mississippi cannot prove beyond a reasonable doubt and to a moral certainty that he is guilty, because he is innocent.
R.372-373.
Article 3, Section 26 of our state Constitution states:
In all criminal proceedings the accused shall have a right to be heard by himself or counsel, or both . ..
In Jones v. State, 381 So.2d 983, 993 (Miss. 1980), wherein the defendant argued his case, this Court held:
The Mississippi Constitution gives the accused the right to be heard by himself or counsel, or both. However, it does not exempt a defendant who argues pro se from following the rules of court procedure. We do note, however, that the trial court should allow him some leeway in arguing his case, each case necessarily resting on its own facts and circumstances.
This problem which seems to have arisen in this state only in recent years, is no doubt nettlesome to trial judges. In Young v. State, 425 So.2d 1022, 1026-1027 (Miss. 1983), Justice Roy Noble Lee speaking for the Court, and in Curlee v. State, 437 So.2d 1, 2 (Miss. 1983), Justice Dan M. Lee, speaking for the Court, have set forth guidelines for the trial courts to follow.
We do hold, however, that Trunell had a constitutional right to make an opening statement without impingement of his constitutional guaranty against self-incrimination, which was denied him by the trial court.
Our law does not require a defendant to make a choice between proceeding pro se and exercising his constitutional right against self-incrimination. He may conduct his entire defense without ever being sworn in or being subject to any cross-examination.
As above noted the trial court still has the responsibility of maintaining order, decorum and appropriate legal proceedings.
Any defendant who desires to act as his own counsel should be carefully warned and instructed by his trial counsel and the trial court prior to his undertaking this task.
REVERSED AND REMANDED.
*827 PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.