# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-KA-00781-SCT

*ROOSEVELT DEXTER ARMSTEAD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/31/96 |
| TRIAL JUDGE: | HON. WARREN ASHLEY HINES |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MARIE WILSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT S. FLYNN |
| DISTRICT ATTORNEY: | FELECIA LOCKHART |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 6/11/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/2/98 |

**BEFORE PITTMAN, P.J., BANKS AND WALLER, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This appeal challenges the validity of convictions for burglary of an occupied dwelling, attempted rape and aggravated assault. After careful review of the circuit court proceedings, we conclude that the court committed reversible error in failing to allow the defendant to make part of his own closing argument. In addition, the jury received a deficient instruction on the offense of attempted rape, constituting an independent ground for reversal on that conviction.

## I.

¶2. On November 18, 1995, at approximately 1:23 a.m., Sharon Perkins was lying on a couch in the front room of her apartment. A man punched his hand through the plastic covering that she had placed over a missing panel of glass on her front door, unlocked the door and entered Ms. Perkins' apartment. She saw him immediately, jumped up onto her knees on the couch and exclaimed, "Who are you? What in the hell! Who the hell are you? Where the hell you going? You in the wrong place!" The man closed the door, then went to the couch and "straddled" Ms. Perkins. As she attempted to push the man off of her she shouted for her 11-year old son, Eric, who ran in and jumped on the man's back. The man swung at Eric, who jumped back and rushed out the front door.

¶3. Ms. Perkins, momentarily free from her attacker, did not leave the apartment because she feared for her two other children, aged five and six, who were asleep in another room. She ran instead toward the bathroom to find something with which to protect herself. In the meantime, her attacker had retrieved a knife from the kitchen. He grabbed Ms. Perkins again and dragged her back to the couch, where he pinned her with his knees. He stripped off her gown as he was jabbing at her with the knife, and repeatedly told her to "shut up." The attacker placed his hands all over her body, including her breasts and vaginal area. During the struggle Ms. Perkins received deep cuts on her left hand. She also received superficial lacerations on her right ear, right hand and left breast. She was still fighting her attacker when her son came back into the room and said, "Mama, the police coming." At that point, the man jumped up and ran from the apartment.

¶4. After being treated at the hospital, Ms. Perkins went to the police station and described her attacker. A composite sketch was done. She then picked the defendant's picture from a photo line-up. Ms. Perkins testified at trial that lights were on in her apartment and that she saw her attacker's face and the clothes he was wearing. She stated that the attacker wore a Seagram's Gin hat on the morning in question, and that it fell off during the struggle and was left at the scene of the crime. Ms. Perkins also testified that she had seen the man before but did not know him personally. Ms. Perkins identified the defendant in court as the man who broke into her apartment and attacked her.

¶5. Photographs taken of the crime scene on the night of the attack could not be developed properly, nor could fingerprints be obtained. Police never recovered the nightgown, the Seagram's Gin hat or the knife because the investigator in charge, Sergeant Lester Carter, did not visit the scene until two days later, by which time the victim's father had cleared all of her belongings from the apartment.

¶6. After the close of the State's case-in-chief Armstead moved for a directed verdict on the ground that the State had failed to make a prima facie case against him. The court denied the motion. Thereafter, the defendant took the stand and claimed that Ms. Perkins had mistakenly identified him as the attacker. He claimed that he had gotten intoxicated and spent the entire night of the incident asleep on a couch at the home of his sister, Brenda Sparks. His two sisters confirmed that on a Friday night prior to his arrest he had come to their home sometime between 7:00 p.m. and 9:00 p.m. and had slept till the next day. Neither of his sisters could say with any certainty, however, that Armstead had spent the night on November 17-18, 1995.

¶7. After a one-day jury trial on May 28, 1996, Armstead was convicted of the crimes of burglary of an occupied dwelling, attempted rape and aggravated assault. On May 31, 1996, he was sentenced to fifteen (15) years for burglary, ten (10) years for attempted rape and twenty (20) years for aggravated assault, with all sentences to be served consecutively. On June 18, 1996, Armstead filed a Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial. On the same day, the circuit court overruled the motion and Armstead filed his Notice of Appeal.

## II.

¶8. Armstead contends that the trial court erred when it denied his motion for a directed verdict. He also claims that the verdict was against the overwhelming weight of the evidence and that the State failed to prove that he was guilty beyond a reasonable doubt. We treat this assignment of error as an appeal from the trial court's denial of Armstead's alternative post-trial motions for judgment of

acquittal notwithstanding the verdict or for a new trial. *See May v. State,* 460 So. 2d 778, 780 (Miss. 1984). In making his arguments, Armstead maintains (1) that his conviction is based upon the uncorroborated testimony of the victim, Sharon Perkins (2) that the victim was mistaken in her identification of Roosevelt Armstead as her attacker, and (3) that the State failed to prove that Armstead designed and endeavored to rape Ms. Perkins.

¶9. It has long been held in Mississippi "that a conviction for rape may rest on the uncorroborated testimony of the person alleged to have been raped, but it should always be scrutinized with caution; and where there is much in the facts and circumstances in evidence to discredit her testimony, another jury should be permitted to pass thereon." *Richardson v. State,* 196 Miss. 560, 564, 17 So. 2d 799, 800 (1944). *See also Goode v. State,* 245 Miss. 391, 394, 146 So. 2d 74, 75 (1962); *Killingsworth v. State,* 374 So. 2d 221, 223 (Miss. 1979); *Goss v. State,* 413 So. 2d 1033, 1034 (Miss. 1982).

¶10. Armstead argues that Sharon Perkins did not have sufficient opportunity to identify him on the night she was attacked. The well-known factors for determining the likelihood of misidentification are outlined by the United States Supreme Court in *Neil v. Biggers,* 409 U.S. 188 (1972). These are:

> (1) The opportunity of the witness to view the criminal at the time of the crime.
>
> (2) The witness's degree of attention.
>
> (3) The accuracy of the witness's prior description of the criminal.
>
> (4) The level of certainty demonstrated by the witness at the confrontation.
>
> (5) The length of time between the crime and the confrontation.

*See id.* at 199-200; *Magee v. State,* 542 So. 2d 228, 232 (Miss. 1989); *Wilson v. State,* 574 So. 2d 1324, 1328 (Miss. 1990).

¶11. The record reflects that Ms. Perkins had lights on in the apartment when the assailant broke in. Ms. Perkins saw the man from the moment he came through the door. Moreover, she had ample time and opportunity to get a close view of the face of the man who was straddling her and ripping off her clothes. Ms. Perkins "was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *See Biggers,* 409 U.S. at 200. She gave a reasonably accurate description of her assailant to the officer at the scene, and on the day after the attack she worked with an investigator to create a composite of her attacker. Based on this composite, the police then compiled a photo lineup, from which the victim picked out Armstead's picture. The victim never wavered from her identification and evinced little doubt at trial that it was the defendant who attacked her.

¶12. Armstead points out only minor inconsistencies in Ms. Perkins' testimony at trial and her prior statements and descriptions of her attacker. In *Goss,* 413 So. 2d 1033, this Court upheld a conviction of rape although there were inconsistencies between statements attributed to the prosecutrix prior to trial and her testimony at trial. This Court held that the jury had the right to disbelieve the alibi defense of the defendant and resolve all conflicts of testimony in favor of the prosecutrix. *Id.* at 1036. In the present case, the jury similarly rejected Armstead's rather weak alibi defense and chose to put its faith in the reliability of the victim's identification. The jury's verdict, though based solely on this identification, is neither legally insufficient nor against the overwhelming weight of the evidence.

¶13. Armstead advances an alternative argument that even if he were assumed to be the attacker, there was insufficient proof that he designed and endeavored to rape Ms. Perkins and thus his conviction for attempted rape must be reversed. The question raised is whether the jury could reasonably have believed that he performed an overt act toward the commission of the crime of rape, and either failed therein or was prevented from committing the crime. *See **Harden v. State,*** 465 So. 2d 321, 323 (Miss. 1985); Miss. Code Ann. § 97-1-7 (1994).

¶14. Although Armstead's conviction for attempted rape must be reversed for other reasons, there is no independent merit to the claim raised here of whether there was sufficient proof to find a criminal offense on Armstead's part. The record adequately reflects that Ms. Perkins' assailant broke into her apartment, tore her clothes off, pinned her on the couch, threatened and injured her with a deadly weapon and groped the victim's breasts and genital area. Moreover, he only jumped up and left when Ms. Perkins' son came back into the room and stated that the police were coming. Had there been no other errors, the jury could reasonably have found that the appellant did not voluntarily cease his attack, but was prevented from committing the crime out of fear of the imminent arrival of the police.

**III.**

¶15. Armstead contends that the trial court erred when it refused to permit him to make part of his own closing argument to the jury. After the State rested and the defense had presented its two alibi witnesses, the defendant, the defense attorney and the prosecutor went into chambers for an on-the-record discussion concerning the defendant's right to testify on his own behalf. The defense attorney told the court that the defendant, having had his rights explained to him, did not want to testify but did want to make part of the closing argument to the jury. The State objected, arguing that the defendant should not be allowed to testify while he was not under oath or subject to cross-examination. After listening to both sides, the trial judge denied Armstead's request on the ground that the defendant would prejudice his own case if he were allowed to speak to the jury. The court stated:

> Well, I'm going to deny the defendant's request. I feel like that--I understand his position if he either wants to testify or does not want to testify as far as putting evidence to the jury, and I can understand why he would desire to or would desire not to; however, looking at the jury and looking at the defendant, I'm concerned that if he attempts to do your job, which you're doing quite well, that he would prejudice the jury against him, and so for that reason--for his own best interest I'm going to deny the request.

The trial court also remarked to the defendant that "I'm doing this for your own good. I'm not going to let you make that kind of mistake." Based upon the trial court's ruling, the defendant then decided that he would testify.

¶16. The right of the defendant to make his own opening and closing arguments has been repeatedly upheld by this Court. *See, e.g., **Gray v. State,*** 351 So. 2d 1342, 1345 (Miss. 1977); ***Jones v. State,*** 381 So. 2d 983, 993 (Miss. 1980); ***Trunell v. State,*** 487 So. 2d 820, 825-26 (Miss. 1986); ***Bevill v. State,*** 556 So. 2d 699 (Miss. 1990). This right is grounded upon our State Constitution, which provides that "[i]n all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both. . . ." Miss. Const. art. 3, § 26. It is clear under our law that invoking this right does

not override the defendant's separate right under the State and Federal Constitutions against self-incrimination.[1] In *Trunell,* this Court stated:

> We do hold, however, that [the defendant] had a constitutional right to make an opening statement without impingement of his constitutional guaranty against self-incrimination, which was denied him by the trial court.

> Our law does not require a defendant to make a choice between proceeding pro se and exercising his constitutional right against self-incrimination. He may conduct his entire defense without ever being sworn in or being subject to any cross-examination.

*Trunell,* 487 So. 2d at 826. *See also Jones,* 381 So. 2d at 993 (defendant may choose to argue his case to the jury and at the same time invoke the Fifth Amendment); *Bevill,* 556 So. 2d at 710 (defendant may make opening statement and later refuse to take the witness stand).

¶17. The defendant who argues pro se, of course, is not exempt from following the rules of court procedure, and must confine his remarks to the evidence in the record. *Jones,* 381 So. 2d at 993-94; *Trunell,* 487 So. 2d at 826. Thus, a "dilemma" is presented by the accused who uses his constitutional right to argue his case to the jury to give, what are for all practical purposes, unsworn testimonial statements which are not supported by the record. *Jones,* 381 So. 2d at 993. *Jones* makes clear, however, that the "practical solution" to this dilemma is not to deprive the defendant of his right to address the jury, but to warn him that if he makes unsupported statements, those statements will be treated as a "partial waiver" of his privilege against self-incrimination. *Id.* at 993-94. *See also Trunell,* 487 So. 2d at 826. The State will then be free to comment upon the fact that no such statement was made by him as a witness under oath. *Jones,* 381 So. 2d at 993-94; *Bevill,* 556 So. 2d at 710.

¶18. The parties agree that the present dispute involves a more fundamental question which must be answered before determining that the trial court should have followed the *Jones* procedure. The court's decision in refusing to allow Armstead to give part of his closing argument was not made to keep him from giving unsworn testimony, but was clearly made to keep him from prejudicing his own case. Thus, the issue is whether the trial court has the authority to prevent a defendant from exercising his constitutional right to address the jury when a finding is made that to allow this would prejudice the jury against the defendant.

¶19. In the landmark case of *Faretta v. California,* 422 U.S. 806 (1975), the United States Supreme Court firmly established the Sixth Amendment right of criminal defendants to self-representation. That case involved a defendant who sought to dispense with counsel altogether, but was forced by the trial court to conduct his defense only through his lawyer. In *Faretta,* as in all cases where the accused seeks to take complete charge of his own defense, the core problem was whether the criminal defendant's independent right to self-representation compromised his countervailing constitutional right to assistance of counsel. For this reason, the Court held that in order to represent himself the accused must knowingly and intelligently forego the relinquished benefits associated with the right to counsel. *Faretta,* 422 U.S. at 835. Similarly, under our State Constitution, this Court has noted that "[w]hile every accused has the constitutional right to be represented by an attorney, it must be balanced against the right of an accused to represent himself, that is, to present his own case pro se without an attorney." *Metcalf v. State,* 629 So. 2d 558, 562 (Miss. 1993).

¶20. Where a criminal defendant does not forego his lawyer's services, however, there is no tension between the right to counsel and the right to self-representation. "Hybrid representation is considered to encompass both the participation of the defendant in the conduct of his trial when he has not effectively waived the assistance of an attorney to defend him, and the participation by an attorney in the conduct of the trial when the defendant is defending pro se." *Id.* The present case is clearly an example of the first type, since Armstead never intended to dispense with his lawyer's services altogether but sought only to insert himself in the proceedings as "co-counsel." *See id.* In cases of the second type, a defendant's decision to proceed pro se necessarily involves a waiver of his right to counsel. Here, however, Armstead sought to exercise *both* his right to assistance of counsel and his right to address the jury--an option which is plainly allowed. Miss. Const. art. 3, § 26. Thus, no balancing of these countervailing constitutional rights is necessary.

¶21. We are left with the question of whether a criminal defendant can be forbidden from exercising a clearly established constitutional right merely because the trial judge determines that to do so will prejudice the defendant's case. We conclude that, as a general rule, any such right which is not outweighed by another concern of equal stature requires more than a determination of prejudice to override the defendant's free choice.

¶22. Of course, trial courts need not grant criminal defendants complete freedom to make their own choices at trial. For example, in *Blanco v. Singletary,* 943 F.2d 1477 (11th Cir. 1991) the defendant and his defense attorney disagreed on whether to call two particular witnesses, and the trial court allowed the defendant and not his defense attorney to make the decision. The Eleventh Circuit remarked that "[w]hile attempting to be helpful to Blanco the trial court overreached its authority and infringed upon the relationship between Blanco and his attorneys by requiring defense counsel to call two additional witnesses. Generally, trial tactics are for defense counsel to formulate." *Id.* at 1495. *See also* *Jones v. Barnes,* 463 U.S. 745 (1983) (holding that defendant has no right to determine which nonfrivolous issues appointed counsel would press on appeal).

¶23. In the present case, however, defense counsel and the defendant were in agreement regarding the defendant's wish to make part of his own closing argument. Moreover, the right asserted by Armstead was of constitutional stature and could not be overridden merely because the trial court--or for that matter, his attorney--determined that it would be prejudicial.

¶24. In *Faretta,* the Court addressed the question of the potential prejudice caused by a defendant's self-representation after a knowing and voluntary waiver of his right to counsel:

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled effort. But. . .it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."

*Faretta,* 422 U.S. at 834 (quoting *Illinois v. Allen,* 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)). *See also Godinez v. Moran,* 509 U.S. 389, 399 (1993) ("the competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself").

¶25. Similarly, when a represented criminal defendant in our courts exercises his right to address the jury under Article 3, § 26 of the Mississippi Constitution, it is the defendant who will reap the benefits of a wise decision and suffer the consequences of a poor one. There are at least two conceivable limits on the exercise of this personal decision. The first is a determination that the defendant is so unable or unwilling to abide by rules of procedure and courtroom protocol that the "partial waiver" solution outlined in *Jones* is inadequate to prevent a disruption of the trial. *See Faretta,* 422 U.S. at 834 n.46 ("the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct"). Second, the defendant may be so physically or mentally incompetent to speak to the jury that his right to a fair trial is endangered. *See, e.g., Savage v. Estelle,* 924 F.2d 1459 (9th Cir. 1990) (defendant whose severe speech impediment made him unable to communicate to the jury did not have right to represent himself).[2]

¶26. In this case, Armstead merely requested to make part of his own closing argument. The record reflects that he was capable of understanding any limits the court might place on what he could say, and also of understanding that if he strayed beyond these limits the State could then comment upon his unwillingness to testify under oath pursuant to *Jones.* There is no indication that Armstead sought to undermine court protocol or disrupt the trial by purposely violating any rules. Moreover, Armstead was physically and mentally competent to address the jury in a manner that would not have endangered his right to a fair trial. For these reasons, the appellant's convictions must be reversed and remanded for a new trial.

## IV.

¶27. Armstead alleges that the trial court erred when it gave the jury a deficient instruction regarding the evidence necessary to prove the crime of attempted rape. Instruction S-2, the sole instruction given on the attempted rape charge, read as follows:

> The Court instructs the Jury that if you find beyond a reasonable doubt that ROOSEVELT DEXTER ARMSTEAD, on or about the date testified about, did unlawfully, wilfully, feloniously and forcibly attempt to rape and ravish Sharon E. Perkins, a female human being over the age of fourteen (14) years, by ripping the nightgown off Sharon E. Perkins after having thrown her onto a couch and attempted to straddle her, against the will and without the consent of the said Sharon E. Perkins, then it is your sworn duty to find the defendant guilty of attempted rape as charged in Count Two of the Indictment.

Armstead correctly points out that this instruction does not mention the requirement that he either failed or was prevented from completing the act, which is a separate element of the offense. *See Harden,* 465 So. 2d at 323. This deficiency was timely objected to by defense counsel. In support of his claim, the appellant cites *Henderson v. State,* 660 So. 2d 220 (Miss. 1995). In *Henderson,* this Court held that an instruction for attempted capital rape which did not mention failure or prevention of completion did not adequately set forth the elements of attempted rape. *Id.* at 223.

¶28. The State concedes that *Henderson* is directly on point, and invites this Court instead to reconsider its opinion in that case. The State adopts as its argument the dissenting opinion in *Henderson*, in which Justice Smith pointed out that the word "attempt" in its common and ordinary meaning *denotes* frustration of the completion of the act:

> Attempt is defined in *Black's Law Dictionary,* Revised Fourth Edition, as: "An effort or endeavor to accomplish a crime, amounting to more than mere preparation or planning for it, which, if not prevented, would have resulted in the full consummation of the act attempted, but which, in fact, does not bring to pass the party's ultimate design." *Id.* at 162.

*Henderson,* 660 So. 2d at 224 (Smith, J., dissenting). The State contends that the jury in the present case understood the meaning of the word "attempt" and the charge on which Armstead was indicted.

¶29. Our attempt statute prescribes punishment for "[e]very person who shall design and endeavor to commit an offense, and shall do any overt act toward the commission thereof, *but shall fail therein, or shall be prevented from committing the same*. . . ." Miss. Code Ann. § 97-1-7 (1994) (emphasis added). *Henderson* merely requires that the jury be instructed to find, pursuant to the language of the statute, that the defendant failed to complete the intended act or was prevented from doing so. We do not consider it an inordinate burden on the State to include such an instruction. *Henderson* was decided nine months before the trial in this case, and there is little excuse for the omission of this instruction. Therefore, Armstead's conviction for attempted rape must be reversed and remanded for a new trial.

¶30. We note in passing that the instruction here is also weak in terms of properly instructing the jury as to the intent required to find the defendant guilty. The crime of attempt requires the specific intent to commit a particular offense. *See, e.g., McGowan v. State,* 541 So. 2d 1027, 1030 (Miss. 1989). In the present case, the jury should ideally have been instructed that if it found that Armstead ripped the nightgown off of Sharon Perkins and straddled or attempted to straddle her, with the specific intent to forcibly rape and ravish her, then it would be the jury's sworn duty to find Armstead guilty of attempted rape. While we have in the past declined to reverse a conviction based upon instructions similar to the one above, *see, e.g., Lester v. State,* 692 So. 2d 755, 789-90 (Miss. 1997), it is preferable that the trial court expressly state to the jury that the defendant, to be guilty of attempt, must have performed certain actions with the specific intent to commit the target crime.

## V.

¶31. For the foregoing reasons, Armstead's convictions for burglary of an occupied dwelling, attempted rape and aggravated assault are reversed and remanded for a new trial.

¶32. **REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., AND McRAE, J., CONCUR. WALLER, J., CONCURS IN RESULT ONLY. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ.**

   **SMITH, JUSTICE, DISSENTING:**

¶33. I agree with the majority view that Armstead should have been allowed to make a part of his closing argument. However, in my view the jury did not receive deficient instructions on the offense of attempted rape.

¶34. I dissented in **Henderson v. State**, 660 So. 2d 220 (Miss. 1995) regarding this same issue and I therefore adopt my dissent there in the case *sub judice*. The jury in the case at bar was adequately instructed and needed no further instruction. "It goes without saying that the very word "attempted" implies failure or prevention of completion of an act." *Id.* at 224. This Court has consistently held other words of common and ordinary meaning need no further definition as they are easily understood by the jury. *See Chase v. State*, 645 So. 2d 829 (Miss. 1994), (Smith, J.); *Allman v. State*, 571 So. 2d 244 (Miss. 1990). Additionally, this Court has required that a word's common and ordinary definition must be utilized in the absence of statutory definition. **Board of Trustees of State Insts. of Higher Learning v. Mississippi Publishers Corp.**, 478 So. 2d 269 (Miss. 1985).

¶35. Here, Armstead's jury was instructed that he only attempted to rape the victim and the evidence clearly demonstrated that he was prevented from accomplishing the completed crime of rape only because the victim's young son ran back into the room where Armstead was straddling the victim, knife in hand, having previously torn off her nightgown and in the process of attempting to rape her. Only when the child yelled out that "the police are coming" did Armstead stop his attempt to rape the victim. There is absolutely no way under these facts and the instructions given that this jury would have been confused. No reversal error is present.

¶36. I respectfully dissent.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

1. The Fifth Amendment to the United States Constitution provides, "nor shall any person. . .be compelled in any Criminal Case to be a witness against himself. . . ." U.S. Const. amend. V. The Mississippi Constitution similarly provides that "the accused. . .shall not be compelled to give evidence against himself. . . ." Miss. Const. art. 3, § 26.

2. *Savage* and the other cases cited by the State for this proposition involve cases in which the defendants sought to waive their right to counsel and proceed alone. It is difficult to imagine a case, however, in which a defendant could endanger his right to a fair trial by merely addressing the jury during opening or closing arguments. As in Armstead's case, trained counsel stands ready to remedy any potential prejudice.